Robert J. BENNETT and Patricia Ann Bennett, and
Raymond C. Meyer, d/b/a Ray's Honey Farm,
Plaintiffs-Appellants-Petitioners,†

v.

The LARSEN COMPANY, a Wisconsin corporation, and
Hartford Accident & Indemnity Company, an insur-
ance corporation, and Ag-Aire, Inc., Defendants-
Respondents.†

Supreme Court

*No. 82–1461. Argued March 28, 1984.—Decided May 30, 1984.*

(Also reported in 348 N.W.2d 540.)

† Motions for reconsideration denied, July 24, 1984, without
costs. HEFFERNAN, C. J., and WILLIAM A. BABLITCH, J., not par-
ticipating.

For the plaintiffs-appellants-petitioners there were briefs by *Samuel Zelpe* and *Rabinovitz, Sonnenburg & Zelpe,* Sheboygan, and oral argument by *Samuel Zelpe.*

For the defendants-respondents, The Larsen Company and Hartford Accident & Indemnity Company, there was a brief by *Joseph J. Beisenstein* and *Menn, Nelson, Sharratt, Teetaert & Beisenstein, Ltd.,* Appleton, and oral argument by *Peter S. Nelson.*

For the defendant-respondent, Ag-Aire, Inc., there was a joint brief by *Thomas W. Conklin* and *Gabert & Williams,* Appleton, and *Catherine E. Tinker* and *Conklin & Adler, Ltd.,* Chicago, Illinois, and oral argument by *Ms. Tinker.*

WILLIAM G. CALLOW, J.   This is a review of a decision[1] of the court of appeals affirming the judgment

---

[1] *Bennett v. Larsen Co.,* 114 Wis. 2d 265, 338 N.W.2d 510 (Ct. App. 1983).

of the circuit court for Outagamie county, Judge Gordon Myse, dismissing an action for damages for the death of honeybees allegedly caused by negligent pesticide spraying. We reverse in part and affirm in part and remand the cause for further proceedings consistent with this opinion.

The issues presented on appeal are whether the circuit court erred (1) in failing to instruct the jury that violation of label directions in spraying pesticides constitutes negligence per se; that pesticide users are strictly liable for any harm they cause because pesticide spraying is an ultrahazardous activity; that pesticide users owe a higher duty of care to those who may be harmed by pesticides because pesticides are a dangerous substance; and (2) in failing to grant post-trial motions to change the jury's verdict answers, grant judgment notwithstanding the verdict, or grant a new trial.

The plaintiffs in this case are beekeepers in Outagamie county. In 1977 and 1978, the plaintiffs maintained a number of bee colonies throughout the county, with some of the hives located near sweet corn fields.

The defendant, The Larsen Company, leased land in 1977 and 1978 on which sweet corn was grown under contract with area farmers for the company's food processing operation. Under the growing contract with the farmers, Larsen was responsible for monitoring and treating the fields for insect problems.

In 1977, Larsen employees found that some sweet corn fields were infested with corn borers and earworms. In order to control these pests, Larsen contracted with Ag-Aire, Inc., to spray the pesticide Sevin on the affected fields. The Sevin label included the following warning:

"BEE CAUTION: MAY KILL HONEYBEES IN SUBSTANTIAL NUMBERS
"This product is highly toxic to bees exposed to direct treatment or residues on crops. . . .

"Do not use when value of honeybees as pollinators is more important than insect control. Before applying, warn beekeepers to locate hives beyond bee flight range until one week after application or to take other equally effective precautions."

Sevin is a slow-acting pesticide which kills honeybees after they ingest contaminated pollen. Its residual toxic effect remains on the sprayed crops for three to six days, but one witness testified that its toxic effect on stored pollen can last for several months. Larsen's records indicated that several thousand acres of sweet corn were sprayed with Sevin during August, 1977. The record indicates that the defendants did not warn or take any steps to warn affected beekeepers in 1977.

On August 13, 1977, Robert Bennett observed a helicopter aerially spraying a sweet corn field near his home. After the spraying Bennett noticed that many of the bees in an observation hive at his home were dead or dying. Bennett also observed severe damage to several other of his colonies in the vicinity of the sprayed field. Although Bennett was unable to identify the helicopter as belonging to Ag-Aire, Inc., company records showed that Larsen fields were sprayed on August 13, 1977, and testimony revealed that the sprayed field was owned by a farmer growing sweet corn under contract to Larsen. The next day Bennett saw Larsen trucks and personnel in the sprayed field. On August 17, 1977, Henry Malchow, the Agricultural Stabilization and Conservation Service (ASCS) executive director for Winnebago County, inspected the Bennett hive locations and reported that the bees had been killed by exposure to Sevin.

In early 1978, in response to problems raised by bee kills from pesticide spraying, the Outagamie County Beekeepers Association f.rmed a pesticide committee.

The committee's purpose was to gather and provide information on the use of pesticides and to foster communication between beekeepers and pesticide users. At the committee's first meeting in February, 1978, a program was begun to have beekeepers mark their hive locations on plat maps which would also be marked by Larsen with fields which might be subject to pesticide spraying. Carl Hanamann, chief fieldman for Larsen, attended this meeting and was subsequently provided with plat maps showing the hive locations and a list of beekeepers, their addresses and telephone numbers, and the townships where they kept their hives.

In the summer of 1978, inspections of Larsen's corn fields revealed that they were again infested with corn borers and earworms. On July 18, 1978, Hanamann telephoned Paula Jorgensen, the chairperson of the pesticide committee, to inform her that Larsen planned to spray certain fields as soon as the weather cleared. Hanamann called Jorgensen on July 20, 1978, to indicate to her when and where Larsen was spraying. After receiving this call, Jorgensen called Bennett and Raymond Meyer to inform them that fields near their hives were to be sprayed. Neither Bennett nor Meyer took any steps to prevent the bees from foraging in or near the affected fields.

After the July 1978 sprayings, Bennett and Meyer inspected their hives and found many to be severely damaged. In reports filed by ASCS inspectors, the cause of bee deaths was identified as exposure to the pesticide Lannate, which Larsen records indicated was used in spraying during the summer of 1978. The Lannate label included the following language:

"This product is toxic to bees and should not be applied when bees are actively visiting the area. Apply late in evening or early morning where honey bees visit fields. . . ."

Lannate is a mixture formulation which contains both fast-acting and slow-acting chemicals. Thus, it kills bees on contact, but also has a residual toxic effect of up to three to six days.

The Bennetts and Meyer filed a complaint alleging that the defendants negligently applied the pesticides in 1977 and 1978 and that these actions led to the destruction of numerous bee colonies. The Bennetts sought damages for the August 1977 and July 1978 sprayings; Meyer sought damages only for the July 1978 sprayings. After trial the jury found that The Larsen Company, Ag-Aire, Inc., and Ag-Aero, Inc., were not negligent in either the 1977 or 1978 sprayings. The jury also found that the Bennetts and Meyer were negligent for failing to take reasonable precautions to protect their bees from damage during the July 20–23, 1978, sprayings. The circuit court denied the plaintiffs' motions for a change of answers to certain verdict questions, for judgment notwithstanding the verdict, and for a new trial. The circuit court on June 30, 1982, entered judgment dismissing the plaintiffs' complaint on the merits and with prejudice.

The plaintiffs appealed the judgment to the court of appeals. The plaintiffs claimed that the circuit court erred in failing to instruct the jury that the violation of label directions constitutes negligence per se, that pesticide users are strictly liable for damages they cause because pesticide spraying is an ultrahazardous activity, and that pesticide users have a higher than ordinary duty of care because they work with a dangerous substance. The plaintiffs also contended that the circuit court erred in not granting their posttrial motions.

The court of appeals affirmed the judgment. The court concluded that, even if the defendants owed some duty by virtue of the applicable administrative regulations or statutes mandating pesticide usage in conformity

with label directions, the evidence showed that the defendants did not violate the label directions in either 1977 or 1978. The court concluded that pesticide spraying should not be considered an ultrahazardous activity and that, therefore, no jury instruction on strict liability was warranted. The court also concluded that, even if the defendants owed a higher than ordinary duty of care to those whose bees might come into contact with the pesticides, the duty was satisfied by the warnings given in 1978. Finally, the court determined that the trial court did not err in denying the plaintiffs' posttrial motions because the evidence was sufficient to support the jury's verdict that the defendants were not negligent in their sprayings and that the plaintiffs were negligent in failing to take precautions in 1978 after they had been warned of the sprayings.

The plaintiffs argue that the circuit court should have instructed the jury that administrative regulations and state statutes place upon pesticide users the duty to follow label directions and that the failure to adhere to label directions constitutes negligence per se.[2] The plain-

---

[2] The circuit court gave the following instruction to the jury:

". . . [W]hile no person has the right to deliberately or wantonly destroy the property of another, neither the Larsen Company nor the pesticide applier has a duty to protect the bees located in the fields at the time the pesticide is applied. In addition, neither the Larsen Company nor the applier of the pesticide has a duty to protect bees who visit the field after the spraying has been completed from harm occurring as a result of the spraying.

"However, the Larsen Company and the pesticide applier have a duty to exercise reasonable care in carrying out the spraying operations so as to protect the people and property outside the area where the pesticide is applied from harm or damage. If the spray is unintentionally applied to property other than that leased by the Larsen Company, or if the spray drifts onto other property, you should find that the person applying the pesticide is negligent.

tiffs also contend that this duty applies to bees whether they are on or off the sprayed field.

At common law, the landowner has the right to make use of the land as he or she sees fit. This privilege, however, is qualified by due regard for the interests of others who may be affected by the landowner's activities on the property. Thus, the landowner or possessor is under an obligation to make reasonable use of the property so that no unreasonable harm is caused to others in the vicinity. W. Prosser, *Handbook of The Law of Torts,* sec. 57 at 351 (4th ed. 1971) [hereinafter cited as *Prosser on Torts*] ; *see generally Hass v. Chicago & North Western Railway Co.,* 48 Wis. 2d 321, 325, 179 N.W.2d 885 (1970). Thus, the landowner or possessor could take reasonable steps to protect growing crops by spraying insecticides but had to exercise reasonable care to ensure that the pesticides were not sprayed on or did not drift onto others' property. If pesticides were oversprayed or drifted onto adjacent properties, the pesticide user could be held liable for

"Now, you will note that there are three questions that inquire into the negligence of the applier of the pesticide, Ag-Aire, Inc. in 1977 and Ag-Aero, Inc. in 1978. In considering the question of negligence in regard to the pesticide appliers, you should consider the manner and method in which the pesticide was applied to the fields in question, whether the pesticide drifted to adjacent property, and whether the pesticide was applied in accordance with the instructions contained upon its label.

"In considering the question regarding the negligence of the Larsen Company, you should consider the decision to spray the fields, the control they exercised or failed to exercise in regard to the manner and method in which the application was made to the fields, including the time at which the application was made, and the weather conditions existing on the day of the application, and all other facts and circumstances surrounding their decision to have the pesticide applied to its fields."

any resulting damages. *See Lenk v. Spezia,* 95 Cal. App. 2d 296, 300, 213 P.2d 47, 50 (1949), and cases cited therein; *see also Lundberg v. Bolon,* 67 Ariz. 259, 267, 194 P.2d 454, 459 (1948); *S.A. Gerrard Co. v. Fricker,* 42 Ariz. 503, 27 P.2d 678 (1933); *Miles v. A. Arena & Co.,* 23 Cal. App. 2d 680, 685, 73 P.2d 1260, 1263 (1937); 3A C.J.S. *Animals* sec. 275 at 798 (1973). However, most courts have held that possessors of land were not responsible for damages caused to bees that came onto the property which was sprayed. In *Lenk v. Spezia, supra,* for example, the court in upholding the dismissal of a cause of action for bees killed while on the sprayed property stated:

"If plaintiff's bees procured the poisonous compound from which they died while they were trespassing on the fields of other owners of land, it appears that the plaintiff could not recover damages unless the poison was distributed wantonly, maliciously, or with the deliberate intent to injure or destroy the bees. There is no evidence in this case of such wanton or malicious conduct. Under such circumstances there was no duty on the defendants or the owners of the land to protect plaintiff's trespassing bees from the danger of said poisonous compound." 95 Cal. App. 2d at 302–03, 213 P.2d at 51 (citations omitted).

*See also McKennon v. Jones,* 219 Ark. 671, 675, 244 S.W. 2d 138, 140 (1951); 3A C.J.S. *Animals* sec. 279 (1973).[3]

[3] Generally, courts have premised their decisions that pesticide users are not liable for damage to bees on the sprayed property on the theory that bees are trespassers. We do not think that a trespass analogy is correct for this situation. Bees are by nature foragers that fly to and from fields wherever there is nectar and pollen. There are no means to keep them from foraging, except for short periods of time, and there is no way for land possessors to prevent bees from entering their property.

Traditional trespass theory must include the notion that the trespasser can be kept off the property. It is the uninvited entry onto the property which makes the activity a trespass. *See gen-*

In 1977 Wis. Adm. Code sec. Ag 29.10(1) provided, in part, "No person shall use . . . pesticides contrary to label directions, or in a careless or reckless manner." This regulation was adopted pursuant to sec. 94.69, Stats., 1975, which permitted the Department of Agriculture to adopt rules "[t]o govern the labeling of pesticides" and "[t]o govern the use of pesticides . . . and to determine the times and methods of application and other conditions of use." *See* secs. 94.69(5) and (9), 1975. In 1978 sec. 94.70(3)(g), which was created by Ch. 106, Laws of 1977, effective October 22, 1977, provided that "[n]o person may: . . . [u]se any pesticide in a manner inconsistent with its labeling." In 1977 sec. 94.71, 1975, provided certain criminal penalties for violation of the applicable statutes or regulations; in 1978, after amendment by Ch. 106, Laws of 1977, sec. 94.71, 1977, provided civil forfeitures for violations and criminal penalties for knowing violations of the statutes or regulations.

This court has adopted the rule that "one who violates a criminal statute must be held negligent *per se* in a

---

*erally* W. Prosser, *Handbook of The Law of Torts*, sec. 58 (4th ed. 1971). If there is no way for the land possessor to prevent the entry or to eject the trespasser, that status becomes meaningless insofar as it relates to the rights and duties of the land possessor toward the putative trespasser. We conclude that bees fall into this category and, therefore, should not be considered trespassers as such. However, we do not think that land possessors are liable, at least under the common law, for damage to bees on their property. We conclude that, because land possessors have the right to reasonably use their property as they see fit, and because bees tend to enter property and there is little the land possessor can do to prevent their entry, there should be no common law duty owed to protect the bees on the property, except that the land possessor cannot intentionally or wantonly destroy the bees. However, this is not to say that, as we discuss in this opinion, land possessors may not have a duty toward bees on the property imposed by statutes or administrative regulations, which have the effect of modifying the common law.

civil action for damages based on such violation." *Mc-Aleavy v. Lowe*, 259 Wis. 463, 475, 49 N.W.2d 487 (1951). Related Chapter 94, Stats., violations have been treated as negligence per se. *Perry Creek Cranberry Corp. v. Hopkins Agricultural Chemical Co.*, 29 Wis. 2d 429, 139 N.W.2d 96 (1966), involved a violation of sec. 94.676, which prohibited misbranding of economic poisons. We held that a violation of the statute constituted negligence per se because such a violation was a criminal offense. *See also Perzinski v. Chevron Chemical Company*, 503 F.2d 654, 659 (7th Cir. 1974) (violation of sec. 94.70(1)(b), prohibiting distribution of pesticide based on claims different from its registered representations, constituted negligence per se in civil action); and *Mossrud v. Lee*, 163 Wis. 229, 232, 157 N.W. 758 (1916) ("[A statute requiring proper labeling] having been enacted for the protection of life and property, a violation of it, under a very familiar rule, is negligence *per se*."). Because a violation of the 1977 administrative regulation requiring pesticide use in accordance with label directions was subject to criminal penalties, we hold that a violation of the regulation's standard of care constituted negligence per se.

In 1978 a violation of sec. 94.70(3)(g), Stats., was subject to both *civil* and criminal penalties. Because the conduct alleged in this case would be subject only to a civil penalty, we must determine whether a negligence per se rule should be recognized under our analysis for safety statutes. "When a statute provides that under certain circumstances particular acts shall or shall not be done, it may be interpreted as fixing a standard . . . from which it is negligence to deviate." *Prosser on Torts* sec. 36 at 190. *See also* Restatement (Second) of Torts sec. 285 (1965). We have recognized as safety statutes those legislative enactments which are designed to protect a class of persons from a particular type of

harm. *Walker v. Bignell,* 100 Wis. 2d 256, 268, 301 N.W. 2d 447 (1981). "[W]here a statute is designed to protect a class of persons from a particular type of harm, a violation of the statute which results in that type of harm to someone in the protected class constitutes negligence *per se.*" *Meihost v. Meihost,* 29 Wis. 2d 537, 540, 139 N.W.2d 116 (1966) (footnote omitted); *see also* Restatement (Second) of Torts secs. 286, 288 (1965). However, we have limited the application of this rule, stating, ". . . statutes are not to be extended so as to impose any duty beyond that imposed by the common law unless such statute clearly and beyond any reasonable doubt expresses such purpose by language that is clear, unambiguous, and peremptory." *Delaney v. Supreme Investment Co.,* 251 Wis. 374, 380, 29 N.W.2d 754 (1947) (citations omitted). Whether we apply a negligence per se rule is also dependent upon the legislative purpose in enacting the statute. *See Burke v. Milwaukee & Suburban Transport Corp.,* 39 Wis. 2d 682, 689–90, 159 N.W.2d 700 (1968).

We have recognized that the Economic Poisons Act was intended to provide protection from economic poisons which were highly toxic to people, plants, and animals and which were a danger to public health and safety. *See Perry Creek,* 29 Wis. 2d at 435. In discussing the duty of care established by the Economic Poisons Act, we stated: "The purpose and scope of the Wisconsin act were to extend protection from economic poison, we believe, beyond that afforded by the common law." *Id.*[4] This conclusion finds support in the legis-

[4] In Ch. 106, Laws of 1977, the legislature revised the statutes which were originally enacted under the Economic Poisons Act. The purpose of the changes was stated to be "the need to update the regulation of the use and application of pesticides." We find nothing in these changes to indicate that the legislature

lative purpose stated by the Agriculture Committee in reporting the Act out of committee:

"[T]he dangers that are inherent [in the use of economic poisons] warrant careful regulation and control of the use of economic poisons.

" . . . .

"Under our present law, there is no regulation whatever for many [economic poisons] now on the market. Consumers are not properly protected, and since many of these economic poisons contain materials highly toxic to man and dangerous to plants and animals if *improperly used*, public health and safety in our state require improvement of our present practices." Agriculture Committee, Explanatory Note to Economic Poisons Bill (July 13, 1950) (emphasis added).

We conclude that this shows a "clear, unambiguous, and peremptory" legislative purpose to modify the common law by enacting safety legislation which would comprehensively protect the people, animals, and plant life of this state from the improper use of potentially dangerous pesticides. This legislative purpose was carried out, in part, by requiring pesticide users to use and apply pesticides in accordance with label directions. The harm which pesticide statutes sought to prevent was the improper use of pesticides dangerous to people, animals, and plant life. The label directions accompanying each pesticide inform the user of what life may be affected by the pesticide and of the optimal way to use and apply the pesticide in a manner which will minimize the risk of harm to affected life. Based upon this legislative purpose, we conclude that sec. 94.70(3)(g), Stats., established a duty of care for pesticide users to follow

intended to modify the original purpose of the Economic Poisons Act. These changes appear to indicate that the legislature intended to strengthen and expand the regulation of pesticides. Thus, our statement in *Perry Creek* that the legislature intended to modify the common law continues to be valid.

label directions in the use of pesticides. We hold that the failure to fulfill that duty of care constitutes negligence per se.

We also conclude that the duty of care established by the 1977 administrative regulation and the 1978 statute extends to the protection of all animal life which could be adversely affected by improper use of the pesticide, as recognized in the label directions.[5] Thus, in this case, the label directions of Sevin and Lannate specified certain precautions which should be taken with regard to honeybees, which, the label specified, could be killed by the toxic effects of the pesticides. We believe that the protection of honeybees necessarily applied to bees whether they were on or off the sprayed field. To apply

---

[5] The defendants argue that establishing a negligence per se rule for label violations permits pesticide manufacturers to define the standard of care and that we should not permit private parties to set liability standards for the rest of society. We disagree that this will result from the holding in this opinion.

Section 94.68, Stats., 1975, provided a procedure for the registration of pesticides for use in Wisconsin. Under this provision, every pesticide sold or used in the state was to be registered annually with the department. The registration process included the submission of a complete copy of the labeling accompanying the pesticide, including directions for use. Secs. 94.68(2)(e) and (5). By this procedure the department in effect incorporated the label instructions into the statutorily created duty of care to use the pesticide in conformity with its label directions. Thus, the label instructions are not merely a standard established by the manufacturer but are governmentally adopted standards for the safety and protection of the public. Moreover, even though the standard of care will necessarily change from pesticide to pesticide, this ensures that the standard is tailored to the effects and uses of the particular pesticide. This procedure is also followed at the federal level under the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. sec. 136a (1982) (Registration of Pesticides). See also sec. 94.70(1)(a), 1981–82 (pesticides sold or distributed within the state must be registered under the federal act).

the common law rule that the pesticide user owed no duty to bees on the property would be contrary to the legislature's intent to protect certain species from the harmful effects of improperly used pesticides. If the protection of bees was dependent upon their location at the time of spraying, the statutory standard of care embodied in the label directions would be rendered meaningless because bees could be killed with impunity even when pesticides were used in violation of that standard of care. Such a result would frustrate the important legislative purpose of ensuring that pesticides are employed in a manner which permits their effective use while minimizing the harmful side effects to plant, animal, and human life. The standard of care is strictly defined by the label directions. As long as the pesticide user follows label directions, there is no liability for damage to bees on the property at the time of spraying or to bees that enter the property later, unless the pesticide user causes damage intentionally or wantonly.

The circuit court's instructions must embody the applicable law so that the jury may be apprised of the standards of conduct required of the party whose acts are under consideration. *Zabinski v. Novak*, 211 Wis. 215, 217, 248 N.W. 99 (1933). We conclude that the circuit court erred in failing to instruct the jury that the defendants were negligent per se if they failed to follow label directions in using the pesticides. The circuit court also erred in instructing the jury that the defendants owed no duty to the bees on the field, because we have concluded that the statutory duty of care applies to all bees regardless of their location. However, this error does not warrant reversal unless the failure to give the proper instructions had a prejudicial effect. "The test in passing on the prejudicial affect [sic] of an erroneous instruction is the probability, not the pos-

sibility, that the jury was misled thereby." *Fleury v. Wentorf*, 82 Wis. 2d 105, 113, 262 N.W.2d 68 (1978) (footnote omitted). We conclude that the failure to give the proper instructions was prejudicial as to the allegations concerning the 1977 sprayings but not prejudicial as to the 1978 sprayings.

The label on Sevin, the pesticide sprayed in 1977, established two requirements to fulfill the duty of care. First, it was not to be used "when value of bees as pollinators is more important than insect control." The court of appeals correctly determined that this applied only to the pesticide user's application on his own property. Because corn is self-pollinating and because the corn was infested with corn borers and earworms, Larsen's decision to apply the pesticide was reasonable as a matter of law.

The second requirement was that beekeepers were to be warned to keep their hives beyond bee flight range until one week after application or to take other equally effective precautions. A reasonable interpretation of this label direction is that pesticide users have an affirmative duty to warn all beekeepers with hives within bee flight range of an affected field that spraying will take place.[6] In order to fulfill this duty, we believe that pesticide users must take reasonable steps to ascertain and warn those who might be affected by the spraying.[7] Moreover, the warning should be given far enough in

---

[6] An expert testified at trial that bees normally forage in an approximately two-mile radius of their hives. Thus, the pesticide user should take reasonable measures to warn beekeepers having hives within approximately a two mile radius of the affected field.

[7] Because the administrative code, through the label, placed the obligation to warn on anyone using the pesticide, we conclude that both Larsen and Ag-Aire had a duty to warn. Under this joint obligation, both would be liable for a failure to warn, but if one fulfilled the duty, the other would be shielded from liability for a failure to warn.

advance of the spraying so as to give the beekeepers sufficient time to take precautionary steps. Once appropriate warnings are given, it becomes the duty of the beekeeper to keep the bees away from the affected field. The pesticide user, having fulfilled the duty to warn, is not liable for the death of any bees that are on the field at the time of spraying or at any time during which the residual toxic effect of that spraying remains. The pesticide user who properly warns is not liable for any secondary bee loss caused by field bees bringing contaminated pollen back to the hive, or any loss to the brood from the lack of care the brood receives from the adult bees due to the death of hive bees.

We believe that this rule properly balances the need for the pesticide user to control insect pests while minimizing the harmful effects to valuable insects such as bees. The allocation of responsibility is equitable because the initial burden is on the pesticide user to warn affected beekeepers, but then the responsibility to take protective measures shifts to the beekeeper, who is in the best position to prevent the bees from coming into contact with the pesticide.[8]

The record shows that in 1977 the defendants did not make any efforts to ascertain or warn beekeepers who had hives within bee flight range of the sprayed fields. The defendants could have accomplished such a warning because beekeeper yard listings existed at least as far back as 1976. Based upon the evidence, the jury rea-

[8] Wis. Adm. Code sec. Ag 29.15(9) now provides that, if beekeepers have requested in advance to be notified, those owning honeybee colonies within 1½ miles of an affected field are to be notified twenty-four hours before the spraying of any pesticide highly toxic to bees. Because this provision was not in effect at the time of the sprayings at issue in this case, we interpret the notice requirements for this case under the applicable label directions for Sevin.

sonably could have found that the defendants were negligent per se and that they were liable for any bees that were killed when they came into contact with Sevin from the sprayed field and for any secondary loss caused by ingestion of contaminated pollen. The jury instruction which was given prevented the jury from finding such liability. We conclude that the plaintiffs were prejudiced by the failure to give a proper instruction because it was probable that the jury was misled by the erroneous instruction given. Accordingly, we reverse the court of appeals and remand for a new trial on the cause of action based upon the 1977 sprayings.

We must next determine whether the instruction should have been given in this case as to the 1978 action. We have held in this opinion that a negligence per se instruction is appropriate for a violation of the duty of care established by sec. 94.70(3)(g), Stats., which we found to be a safety statute. Even assuming the evidence presented in this case would support the giving of a negligence per se instruction on label violations, we find no prejudicial effect from the failure to give the instruction as to the 1978 action.

The label on the pesticide Lannate, which was applied by Ag-Aero, Inc., for Larsen in 1978, required only that it not be applied when bees were actively visiting the fields and should be applied late in the evening or early morning where honeybees visit fields. Meyer testified that sometime in July, 1978, he saw a helicopter spraying an unidentified sweet corn field between 9 and 12 o'clock in the morning, but he could not identify who was doing the spraying. Jorgensen testified that she saw a helicopter spraying on a Larsen field at 2:45 p.m. on July 20, 1978, but she could not identify who was doing the spraying. LeRoy Behm testified that toward the end of July, 1978, he saw a helicopter spray his sweet corn field between 9:30 and 10 a.m., but he, too, could

not identify the sprayer. There also was no testimony or evidence showing drift or overspray in any of the 1978 pesticide applications. However, the ASCS inspectors' reports indicated that the plaintiffs' bees may have been killed by Lannate in 1978.

The defendants' records indicated that 1,133 acres of corn were sprayed with Lannate on July 21, 22, 1978. No records indicated that any spraying was done on July 20, 1978, one of the dates on which, the plaintiffs' claim, a spraying occurred. Donald Qualmann, the raw products manager for The Larsen Company, and Hanamann testified that it was company policy to apply pesticides early in the morning or late in the evening in order to minimize bee kills and the possibility of drift. This policy was conveyed to the applicators, who were made aware of the possible effect of the pesticide on foraging bees. Hanamann was aware that bees might be foraging in Larsen fields because he had the plat maps showing the hive locations. In 1978 the pesticide applicators were told where the bee hives were located near Larsen fields. The testimony at trial also showed that several other canning companies sprayed their crops in the Outagamie county area during the relevant time period.

The evidence in this case which would support a finding of spraying in violation of label directions is inconclusive. It is apparent that Ag-Aero sprayed Lannate for Larsen on at least July 21 and 22, 1978, but there is no direct evidence that these sprayings were done in violation of label directions. Moreover, as the court of appeals noted, even if the jury could have found spraying in violation of the label, it could only speculate as to whether the bees were killed by direct application of Lannate, or by later contact with the residual toxic component of the pesticide, or whether some other pesticide user may have done the spraying. An ASCS in-

spector who visited Bennett's hives approximately two to three weeks after the alleged July 20–23, 1978, sprayings noted that some of the bees had recently died or were in the process of dying. This fact makes it likely that the bees were killed by some other spraying, because Lannate's toxic effect lasts for only three to six days after spraying. The defendants would not be liable for the bees killed by the residual toxic effect because the label directions clearly were meant only to limit the damage caused by the quick kill component of Lannate. On this record, we conclude that it is doubtful that the jury would have reached a different verdict even had a negligence per se instruction been given. Thus, there is only the possibility, not the probability, that the jury was misled by the instruction given in this case.

We also note in this regard that there was credible evidence to support the jury's finding that the plaintiffs were responsible for their own damages in 1978. The record shows that both Bennett and Meyer were warned at least two days in advance that Larsen was going to have fields sprayed. Both admitted that they took no precautions whatsoever to prevent their bees from foraging in the affected fields. Testimony at trial revealed that beekeepers have several options to protect their bees, such as covering the hives with burlap, blocking entrances to the hives, moving the hives to safer locations, installing pollen traps to trap contaminated pollen before it is taken into the hive, and feeding the bees pollen to prevent them from foraging. Although it is apparent that some of these options were difficult to put into practice, the plaintiffs' failure to take any preventive steps warranted the jury's finding that the plaintiffs were negligent and that their negligence caused their damages. We conclude, therefore, that the plaintiffs suffered no prejudice from the circuit court's er-

roneous instruction as to the events in 1978. We affirm that part of the court of appeals' decision relating to the causes of action based upon the 1978 sprayings.

The plaintiffs also argue that the circuit court should have instructed the jury that the defendants were strictly liable for any harm they caused because pesticide spraying is an ultrahazardous activity. The circuit court did not err in not giving such an instruction because we conclude that pesticide spraying should not be considered an ultrahazardous activity.

Section 520 of the Restatement (Second) of Torts (1977) lists the following factors to consider in determining whether an activity is abnormally dangerous such that a rule of strict liability is warranted:

"(a) existence of a high degree of risk of some harm to the person, land or chattels of others;
"(b) likelihood that the harm that results from it will be great;
"(c) inability to eliminate the risk by the exercise of reasonable care;
"(d) extent to which the activity is not a matter of common usage;
"(e) inappropriateness of the activity to the place where it is carried on; and
"(f) extent to which its value to the community is outweighed by its dangerous attributes."

The Restatement further provides:

". . . The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care." *Id.* at comment f.

As indicated on the pesticide labels, pesticides can be highly toxic to honeybees and can cause a significant degree of harm through direct bee kills and subsequent

depletion of hive populations when contaminated pollen is ingested by the hive bees. Although pesticide spraying may produce some risk of harm to honeybees on the property and to bees in hives located off the property from drift or overspray, that risk can be reduced through the exercise of reasonable care in spraying. Precautionary measures to minimize bee kills on the property and to reduce the risk of drift or overspray include monitoring wind speed and direction, temperature and humidity conditions, and spraying at times bees are less likely to forage. An experienced applicator testified that spraying could be accurate to within one or two feet on the target field. Further, pesticide harm can be reduced by carefully following label directions, which are designed to reduce the risk of harm with proper application and use.

Testimony at trial showed that pesticide application to control severe pest infestations is a common activity which is necessary to ensure healthy crop growth. Testimony revealed that several canning companies in the Outagamie County area each year sprayed pesticides on their corn in order to avoid the potential complete destruction of their crops by corn borers and earworms. We conclude that the application of pesticides is a necessary and beneficial activity to ensure the production of adequate and healthy food and that its value to the people of this state outweighs the potential for harm. Accordingly, we hold that pesticide application is not an ultrahazardous activity warranting the application of strict liability for resulting harm.

The plaintiffs also contend that the circuit court should have instructed the jury that the defendants owed a higher than ordinary duty of care because pesticides are dangerous substances, the use of which creates a greater

risk of harm than ordinary activities. *See* 65 C.J.S. *Negligence* sec. 66 (1966). While we agree that pesticide spraying carries with it a certain risk of harm, we believe that the duty of care established by the legislature through the label approval procedure constitutes the appropriate standard of care for pesticide users. We decline to recognize a higher than ordinary duty of care because we conclude that the legislature has definitively spoken by requiring pesticide applicators to use pesticides only in an approved manner and for approved purposes. The legislature, through the label approval procedure, has provided a method to balance the risk of harm with the necessary beneficial use of pesticides. The failure to follow the approved usages, we have held, constitutes negligence per se, and this, we conclude, properly establishes the parameters of the duty of care owed by pesticide users to those who may be affected by pesticide spraying. The circuit court did not err in failing to give an instruction on a higher duty of care owed by pesticide users.

The plaintiffs also assert that the circuit court erred in not changing jury verdict answers, in failing to grant judgment notwithstanding the verdict, and in not granting a new trial in accordance with post-trial motions. Because we have reversed the court of appeals' decision insofar as it relates to the 1977 sprayings, we will address only the issues pertaining to the 1978 sprayings.

The test for determining whether to change an answer in a jury's verdict is to view the evidence in the light most favorable to the verdict and sustain the verdict if supported by any credible evidence. *Nelson v. Travelers Insurance Co.,* 80 Wis. 2d 272, 282–83, 259 N.W.2d 48 (1977) (footnote omitted). Similarly, the trial judge is not justified in setting aside a verdict and directing judgment if there is any credible evidence to support

the jury's findings. *See Home Savings Bank v. Gertenbach,* 270 Wis. 386, 391–92, 71 N.W.2d 347, 72 N.W.2d 697 (1955). "The credibility of witnesses and the weight given to their testimony are matters left to the jury's judgment, and where more than one inference can be drawn from the evidence, this court must accept the inference drawn by the jury." *Shawver v. Roberts Corp.,* 90 Wis. 2d 672, 681, 280 N.W.2d 226 (1979) (citation omitted).

Because we have set forth in some detail the testimony and evidence concerning the 1978 sprayings, we will not reiterate the support for the jury's verdict. We conclude, however, that the testimony and evidence related earlier constituted sufficient credible evidence to support the jury's finding that The Larsen Company and Ag-Aero, Inc., if they did engage in the July 20–23, 1978, sprayings, were not negligent and that the plaintiffs' damages in 1978 were caused by their own negligence. We also have found no prejudicial errors in the jury instructions given that would support the granting of a new trial as to the 1978 sprayings. Accordingly, we conclude that the circuit court did not err in denying the plaintiffs' posttrial motions as they relate to the 1978 sprayings.

*By the Court.*—The decision of the court of appeals is reversed in part, affirmed in part, and cause remanded for further proceedings consistent with this opinion.